We'll hear argument now in the case of Lohmeier against Gottlieb Memorial Hospital. Ms. Hassel Good morning, Your Honors, and may it please the Court, my name is Christina Hassel and I'm representing the Plaintiff Appellant Wendy Lohmeier. The question this Court must answer in this appeal is whether, viewing all the evidence and drawing all inferences in favor of Ms. Lohmeier as the non-movement on a summary judgment motion, a reasonable jury could find that Ms. Lohmeier had carried her burden of casting doubt upon the stated motives of the hospital for their adverse treatment of Ms. Lohmeier. In its brief and below, the hospital has argued for a different standard. The hospital has argued that it is the job of Ms. Lohmeier, facing their motion for summary judgment, to prove that the hospital did not act upon honest beliefs that Ms. Lohmeier was intoxicated at work, that she diverted narcotics from the Pyxis machine, and other policy violations that ostensibly led to her termination. That is not the correct standard on summary judgment. That is the standard that Ms. Lohmeier must prove at trial. What Ms. Lohmeier must do in order to defeat summary judgment in this case was a much lower bar. The case law from this court, as well as the U.S. Supreme Court, has held that when a plaintiff is able to cast doubt upon the stated motives, or a jury need not accept the stated motives of the hospital for reasons such as credibility, that summary judgment must be denied. At bottom, this is not a summary judgment case. Ms. Lohmeier is entitled to have her claims decided by a jury of her peers, and the district court's order granting summary judgment for the hospital in this case should be reversed so that these fact disputes can be resolved at trial. Because this case largely turns on the summary judgment standard, I want to emphasize that in the Miller case and other cases, this court has held that summary judgment may be especially inappropriate in employment discrimination cases because they oftentimes turn on issues like credibility and conflicting stories and evidence. And this court has cautioned lower courts in the employment context and elsewhere not to fall into the trap of weighing evidence or hearing two stories from both parties and selecting the story that seems more credible or perhaps that the district court simply believes more. And so that is not what a court is supposed to be doing on a summary judgment motion. If the plaintiff or the non-moving party can create sufficient doubt as to the stated motives of the hospital, it is not required that the plaintiff affirmatively prove that there has been discriminatory conduct, nor is it necessary for the plaintiff on a summary judgment case to prove that the hospital or the employer did not act on an honest belief with respect to the stated reasons for their actions. So Lohmeyer, all she had to do in order to defeat summary judgment when the proper Rule 56 standards are applied is introduce summary judgment evidence that calls into question what the hospital was saying was their reasons for terminating her employment. And so looking at the evidence presented in this case, Ms. Lohmeyer has more than carried that burden of providing that summary judgment evidence that would be sufficient for a jury to find that there was doubt as to the hospital's stated motives. Ms. Lohmeyer started work on October 11, 2018 at 7 o'clock in the morning. She worked until 6 o'clock p.m. without incident. She had a higher than normal load of patients that day in the ICU. Normally it would be two. On that day it was three. And yet there was no allegation that Ms. Lohmeyer was acting unusually or that her conduct fell below the standards for the hospital until Caroline Wolak allegedly discovered that the morphine had been taken from the Pyxis machine. It's undisputed that there had been no complaint regarding Ms. Lohmeyer's conduct on October 11 up until that point. After Ms. Wolak started the investigation by accusing Ms. Lohmeyer of appearing to be impaired to the charge nurse, Nurse Daniels, the investigation that followed was not an unbiased search for the truth, but rather was seeking to build a case against Ms. Lohmeyer. And so while, for instance, a number of nurses that were on duty that day did state when interviewed that she did appear to be impaired, that was after they had been subjected to rumor mongering regarding Ms. Lohmeyer's appearance. And that these nurses that were being interviewed themselves could have been suspects, in particular Ms. Wolak and Mr. Zalas, the two nurses under whose credentials the drugs were missing. And so the district court accepted for the purposes of summary judgment that Ms. Lohmeyer appeared to be impaired on the date in question and that was sufficient reason for the hospital's disparate treatment of her. However, the evidence as to Ms. Lohmeyer's appearance of impairment was highly disputed. Not only did Ms. Lohmeyer herself state that she did not appear to be impaired, and she has personal knowledge of her own behavior and demeanor on the date in question, but there was also medical evidence to support that conclusion. There was an FFD examination conducted by Dr. Ball, as well as drug test results which were interpreted as being negative by the MRO, the medical review officer who was on duty that day. And so when you have both contrary testimony and it is supported by the examinations of two physicians that were hand-selected by the hospital in order to make that assessment, I believe that... But the medical review officer didn't actually examine Ms. Lohmeyer that day. Dr. Ball did. Correct. The MRO reviewed the drug test results.  And that was not on the same day. I believe it was the day afterwards. And that doctor reviewed the results, deemed them to be negative, and also cautioned the hospital against unfairly treating Ms. Lohmeyer. So obviously there was some cause for concern there. And so that's one piece of evidence where the district court accepted that there was an appearance of impairment when, in fact, the evidence was quite disputed. I want to focus on this appearance of impairment because appearance is how others view you, right? So how can we rely on Ms. Lohmeyer's testimony about how she felt? Maybe she didn't feel impaired, but others viewed her. She appeared impaired to the hospital employees. Can you tease that out? Because I'm having a problem with the evidence of appearance of impairment and how her testimony can create an issue as to how other people viewed her. Unless she has an out-of-body experience, right? No, I don't think there's an out-of-body experience involved. But I do think that generally we have a sense. Are we stumbling over our words? Are we walking in a straight line? Are we nodding off during work? I mean, I think we all know we're having a good day and a bad day, and I think intoxication would just be a very extreme example of a bad day. So the only evidence in the record that you're pointing to that she did not appear impaired is Dr. Ball's something in the medical record, right? Right. Okay. And was that viewed by the decision maker? Well, interestingly not. It was intentionally withheld from the packet of materials that was given to the decision maker. Was that part of a medical privacy policy? No, it's like an internal HR policy. However, there was copious other evidence discussing Ms. Lohmeier's condition on the date in question, so I don't believe that was the reason for withholding it. In fact, we believe that the reason for withholding it is that Nurse Sacamino, who was key in the initial investigation and who was targeting Ms. Lohmeier, was the party that put together the materials. Strangely enough, she included an email from the nurse that admitted Ms. Lohmeier to the ER for her FFD examination, in which the nurse stated she appeared to be impaired, but did not include the contrary report from the attending physician, Dr. Ball, that said that Ms. Lohmeier was walking normally, that she was speaking normally, that she appeared to have her thoughts in order, and released her to not only go home, but to do more work on the floor that day with patients who were in an ICU. So you have a physician whose job it is to make these assessments, and they found that she was competent and able to work that day with patients, even after her FFD examination. I thought Dr. Ball was a little more equivocal than that, because Dr. Ball does say, you know, she's possibly, I have to get the exact language, he doesn't give her a clean bill of health. Right, so there was enough, one thing we have to remember with Dr. Ball, Nurse Sacamino actually told Dr. Ball during the FFD intake that Ms. Lohmeier's counts were off for narcotics, which is absolutely not true. And so, you know, that may have had some influence on Dr. Ball's assessment, but ultimately Dr. Ball, you know, did recognize some conflicting evidence, but came down on the side of releasing Ms. Lohmeier without restriction, under obviously a high-pressure situation where she was going to be treating patients or doing medical records, and she was also allowed to drive home. So while there was some concern, perhaps, that was voiced by Dr. Ball, it didn't rise to the level where Dr. Ball felt there was a policy violation or anything like that that would prevent Ms. Lohmeier from working. With that, I'm out of time. Ms. Gardner. Good morning. May it please the court. My name is Audrey Gardner, and I represent Appellee's Gottlieb Memorial Hospital in Loyola University Medical Center. The district court's judgment granting the hospital's motion for summary judgment should be affirmed because Ms. Lohmeier has failed to present any evidence suggesting that the hospital did not honestly believe that on October 12th of 2018, Ms. Lohmeier, who was an ICU nurse responsible for taking care of critical care patients, had been unfit for duty while on her shift and was also responsible for two narcotics that went missing that same day. I'd like to start by addressing my opponent's argument that the hospital's honest belief is irrelevant. In fact, my opponent expressly just stated that the standard is whether Ms. Lohmeier has set forth evidence suggesting that the hospital's conclusions were not correct. That is absolutely false. This court's decision in Keys v. Fomex made the standard here expressly clear, and that is whether Ms. Lohmeier has cited two specific evidence that shows not that the hospital's decision was perhaps incorrect or unwise or misguided. It is, was the hospital being dishonest in its actions such that discrimination based on her color or national origin could be inferred? And there is simply no evidence in this case, no reasonable juror could conclude that the hospital acted inconsistent with an honest belief that Ms. Lohmeier was unfit for duty, presenting a danger to those critical care patients and was responsible for those two medications that went missing that day. It is undisputed in this case that on October 12th, Ms. Lohmeier had opiates in her system. Additionally, in which my opponent necessarily downplays, there were six separate medical professionals who all reported to hospital management that they thought that Ms. Lohmeier appeared unusually drowsy. She was slurring her speech. She was having a hard time keeping her eyes open. These were not random people who had never seen Ms. Lohmeier before. These were her coworkers who had worked with her time and time again. And suddenly all of them testified consistently that that day something was off. You mentioned just now that it's undisputed that she had opiates in her system. What weight, if any, was given to the results of the drug test in the termination decision? So the drug test results were one piece of a body of evidence that the committee reviewed. And Dr. Evans had stated that Ms. Lohmeier's positive opiate result was ambiguous because on the one hand, she did have a Norco prescription, but the MRO stated he didn't believe she was taking it incorrect. So as to how the opiates got into her system, there wasn't a clear decision there because the MRO said it was ambiguous. However, there was no dispute, and there is no dispute in this case, that there were opiates in her system, and so it was reasonable for the hospital to consider that as a possible explanation for her behavior that day. So to answer your question directly, it was simply one of many factors that all compelled the hospital to the conclusion that Ms. Lohmeier was unfit for duty and presenting a danger to those patients in violation of the hospital's policies. It is further undisputed that that day morphine and fentanyl both went missing from the ICU. It is also undisputed that there's no other individual at the hospital who the hospital saw, according to its understanding of the Pyxis and security records, was in that medication room at the time that both medications were missing. And my opponent makes a lot of arguments in its briefing about what the security or Pyxis records may in fact show, but there is no dispute that the testimony of the witnesses in this case all consistently stated that their understanding, and it wasn't even something that they believed, it was common practice and known at the time that one time clock was slightly behind the other. So at the time when the hospital decision makers were reviewing this, they saw Ms. Lohmeier is the only person who is in that room at about the same time, and that was very, very, very alarming to that. And Ms. Lohmeier has no evidence suggesting that those decision makers did not honestly feel concerned by that, by those records. Did Ms. Lohmeier return to work after the fitness for duty exam? After the fitness for duty exam, Dr. Ball instructed her to wait in the emergency room until the alcohol test results came back. Dr. Ball testified that she had asked Ms. Lohmeier to have someone come pick her up, and Ms. Lohmeier stated that she didn't want her husband to come pick her up. And because Dr. Ball did have reservations about Ms. Lohmeier's demeanor as memorialized in her medical report, she asked her to sit and wait, and after Ms. Lohmeier stated that she didn't want her husband to come pick her up, Dr. Ball said, okay, well, at minimum, I need to get the alcohol test results back. And once she did and saw that the alcohol test results were negative, then she allowed her to go home. And then at that point, she was on suspension while the hospital conducted its investigation. So does the answer to my question, no? Correct.  Another key point in this case is Ms. Lohmeier has no evidence that the hospital didn't behave as if it honestly believed that there was a potential diversion and that Ms. Lohmeier had been unfit for duty. There is no dispute that the hospital not only interviewed every single ICU nurse that day. Ms. Lohmeier contends at various points that the nurses whose logins were on display at the time the medications were removed, that those people were never investigated. That is completely false, and there's no record evidence to the contrary. The evidence only shows that those nurses were interviewed along with every other nurse on the floor. The hospital then collected the relevant security and PCSIS records. They re-interviewed five witnesses. They collected statements from several witnesses. They reviewed Ms. Lohmeier's drug test results, and based on all of this evidence, they reached a conclusion that she had been unfit for duty and had likely diverted the narcotics. Now, my opponent argues that the fact that Dr. Ball's report was not submitted to the committee was intentional. There's absolutely no evidence in the record that supports that conclusion. Their briefs have never cited evidence, and she cannot do so now. There's also no evidence that the failure to submit Dr. Ball's report to the committee for review was just some willy-nilly HR policy. In fact, the testimonies of the 30B6 witness explain that a standard procedure is that any time there is a fitness for duty result, those results go to the hospital's employee health department and never to the committee. I do struggle to understand that because she was sent to Dr. Ball because there was an HR concern. There was an HR concern that she potentially was impaired, not fit for duty. So they sent her to Dr. Ball for the examination. So for the examination results to then go in this medical report vacuum and not be rendered back to those in the HR capacity who are making an HR assessment and decision, it's a bit confounding. I take your position that this is just the hospital policy, but why is that not of concern and something that Ms. Lohmeier wants us to look at? Because in order for there to be sufficient evidence that the hospital was being dishonest, Ms. Lohmeier would have to point to just the opposite, that the hospital disregarded its policies. In fact, that's an argument she routinely makes, that failure to follow policies here would be some evidence of discrimination. But it is undisputed. If you look at the record evidence that the district court viewed and that this court is now limited to, there is no evidence in this record other than it was the hospital's procedures for privacy reasons. So why does the emergency room nurse who evaluates her before Dr. Ball evaluates her, why does that nurse's report go to HR? That wasn't a formal report. Ms. Sacramento, who was responsible for interviewing different people who had interacted with her, contacted the ER nurse who just brought her into the room for the examination about what she observed, and Ms. Amas simply stated in informal what she saw. Could Sacramento have done that with the doctor? Brought her in informally and said, tell me what you saw? There's no evidence in the record that speaks to that. And in any event, the point is that the record evidence shows that this was the hospital's standard procedure. And whether Ms. Lohmeier may or may agree rightly or wrongly, she hasn't cited to any evidence that the hospital's procedure should have been anything else. It's only her self-serving and unsupported argument and opinion that maybe there should have been some other policy. But the point is that this was the hospital's standards, and it consistently followed its standards. It followed its standard protocol in reaching this decision. And a hospital who follows its policies— Thank you, Ms. Scargill. We have your response. Thank you very much. The case is taken under advisement.